YOUNG & THOMPSON
Douglas V. Rigler (pro hac vice)
drigler@young-thompson.com
Jeffrey M. Goehring, 233002
jgoehring@young-thompson.com
209 Madison Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 521-2297
Facsimile: (703) 685-0573

Counsel for Mauna Kea Technologies

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT CALIFORNIA

| | |
|---|---|
| MAUNA KEA TECHNOLOGIES,<br><br>      Declaratory Judgment Plaintiff,<br><br>v.<br><br>ANTICANCER, INC.<br><br>      Declaratory Judgment Defendant;<br>────────────────────<br>ANTICANCER, INC.,<br><br>      Counterclaim-Plaintiff,<br><br>v.<br><br>MAUNA KEA TECHNOLOGIES, and DOES 1-10,<br><br>      Counterclaim-Defendants | Civil Action No.  11-cv-1407 CAB JMA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MAUNA KEA TECHNOLOGIES' MOTION FOR ATTORNEY'S FEES UNDER 35 USC 285**<br><br>Date: October 17, 2013<br>Time: 2:00 p.m.<br>Courtroom: 4C<br>Judge: Bencivengo |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Young & Thompson**
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

BACKGROUND…………………………………………….....2

LEGAL STANDARD…………………………………………….4

AC's ASSERTED CLAIMS AND PATENTS………………………………5

ARGUMENT…………………………………………………...…9

    **I.**    **AC Knew or Should Have Known That Each Of Its Contributory Infringement Claims Was Baseless Because MKT's Microscope Has Easily Identifiable And Substantial Non-Infringing Uses……………………………………………...9**

    **II.**    **AC Knew or Should Have Known That Its Indirect Infringement Claims Were Objectively Baseless Because AC's Asserted Instances Of Third Party Direct Infringement Do Not Constitute Infringement Even Under AC's Proposed Claim Constructions…………………………………………...12**

        **A.**    **The '233 Application Publication does not describe direct infringement of the '384 or '038 Patents………...14**

            **1.**    **The '233 Application Publication does not describe direct infringement of either the '384 or '038 Patent because it does not describe "monitoring . . . metastasis"……………………………………...14**

            **2.**    **The '233 Application Publication does not describe direct infringement of the '384 Patent because it does not describe "orthotopic implantation"……………………………………...16**

        **B.**    **The Stem-Cell Article does not describe direct infringement of the '159 patent under the agreed meaning of the claims…………………………………16**

        **C.**    **AC Knew Or Should Have Known That Territorial Issues Also Preclude The Telomere Article And The**

ii

Stem-Cell Article From Constituting Third Party Direct Infringement……………………………………………...19

III.   AC Knew Or Should Have Known That Its Claims For Direct Infringement Are Baseless Because MKT Is A Device Manufacturer That Does Not Itself Practiced Each Step Of Narrow, Specialized Research Methodologies Such As In AC's Claims……………………………………………………21

IV.   AC Knew Or Should Have Known That MKT's Manuals And Promotional Literature Cannot Support AC's Inducement of Infringement Claims As A Matter Of Law……………………22

V.   AC Knew Or Should Have Known That Its Inadequate Infringement Contentions Rendered Its Claims Baseless……23

VI.   Mauna Kea Should Be Awarded $193,198.50 In Attorney's Fees And Costs……………………………………………25

CONCLUSION…………………………………………………………25

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

iii

11-cv-1407 CAB JMA

# TABLE OF AUTHORITIES

Cases                                                                    Page

*Anderson v. Dir., Office of Workers Comp. Programs*
    91 F.3d 1322 (9th Cir.1996)…………………………………………………...25

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*
    393 F.3d 1378 (Fed. Cir. 2005)…………………………………………………4

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*
    576 F.3d 1348 (Fed. Cir. 2009) (en banc)……………………………..........22

*Deepsouth Packing Co., Inc. v. Laitram Corp.*
    406 U.S. 518 (1972)…………………………………………………...…22

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*
    524 F.3d 1254 (Fed. Cir. 2008)…………………………………………………4

E-Pass Techs., Inc. v. 3Com Corp.
    473 F.3d 1213 (Fed. Cir. 2007)……………………………….................24

*Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*
    279 F.3d 1022 (Fed. Cir. 2002)…………………………………………………12

*Finjan, Inc. v. Secure Computing Corp.*
    626 F.3f 1197 (Fed. Cir. 2010)…………………………………………………...21

*Golden Blount, Inc. v. Robert H. Peterson Co.*
    438 F.3d 1354 (Fed. Cir. 2006)…………………………………………………...9

*Hensley v. Eckerhart*
    461 U.S. 424, 433 (1983)…………………………………………………...25

*Highmark, Inc. v. Allcare Health Mgmt. Sys.*
    687 F.3d 1300 (Fed. Cir. 2012)…………………………………………………4

*iLOR, LLC v. Google, Inc.*
    631 F.3d 1372 (Fed. Cir. 2011)…………………………………………………5

*In re Seagate Tech.*, LLC
    497 F.3d 1360 (Fed. Cir. 2007)…………………………………………………5

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

iv

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

Statutes and Rules

35 U.S.C. § 271(f)………………………………………………………………...13, 22

35 U.S.C. § 285………………………………………………………………*passim*

Fed. R. Civ. P. 26(a)(1)(A)(ii)…………………………………………………………..10

Mauna Kea Technologies ("MKT") submits this memorandum of points and authorities in support of its Motion For Attorney's Fees against AntiCancer, Inc. ("AC") under 35 U.S.C. Section 285.

## INTRODUCTION

No reasonable litigant could have reasonably expected success on AC's patent infringement claim in light of the following facts and such facts were known to AC or are so obvious that they should have been known to AC: (1) MKT's general purpose microscope has substantial non-infringing uses (meaning that AC cannot prove that it does not have substantial non-infringing uses as it must for contributory infringement); (2) the three instances of alleged third party direct infringement relied upon by AC to support its indirect infringement claims do not constitute direct infringement even under AntiCancer's own proposed claim constructions (which precludes both inducement and contributory infringement as a matter of law); (3) MKT is a microscope manufacturer, not engaged in complex animal research protocols, and has not itself practiced each and every element of the asserted method claims in any product demonstrations (precluding AC's direct infringement claims); (4) MKT's brochures, marketing literature, manuals, website, etc. do not teach each step of the asserted method claims, much less each step together and in the claimed order (also precluding AC's inducement of infringement claims); and (5) AC's Preliminary Infringement Contentions are inadequate (rendering AC's claims baseless).

Accordingly, MKT seeks its attorney's fees under 25 U.S.C. 285.

**11-cv-1407 CAB JMA**

## BACKGROUND

This Court's Order of November 9, 2011 (D.I. 8) reviews the circumstances that led Mauna Kea to file this declaratory judgment action.  In short, AC's CEO asserted in letters in 2006 that "[i]t is clear" that the "prime use" of MKT's microscope is to practice the imaging techniques claimed in AC's patents.  Although the 2006 letters did not identify which claims of which patents were asserted to cover which products or activity in what manner, the letters did enclose a proposed license agreement and a "term sheet" requiring payment of hundreds of thousands of dollars.  AC ignored MKT's request for specifics regarding the alleged infringement and nothing further was heard from AC until 2010.

In a letter dated November 22, 2010, AC's counsel sent MKT's counsel a letter that AC's counsel said was "based on review of prior correspondence."  The letter asked MKT to respond to a series of interrogatory-like questions regarding MKT's activities "during the past six years" and requested MKT to provide its response by December 3, 2010.

In the four years between the 2006 and 2010 correspondences, AC had filed nine patent infringement actions in this Court asserting some or all of the patents-in-suit.[1]

---

- [1] 3:05-cv-00448-JLS-AJB filed 03/07/2005 asserting patent Nos. 6,232,523; 6,235,968; 6,251,384; 6,649,159; 6,759,038;
- 3:07-cv-00097-JLS –RBB filed 01/12/2007 asserting infringement of patent Nos. 6,232,523; 6,235,968; 6,251,384; 6,649,159; 6,759,038;
- 3:07-cv-00778-JAH-BLM filed 04/27/2007 asserting infringement of  patent Nos. 5,491,284 and 5,569,812, as well as various other claims;

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

Accordingly, MKT filed a complaint for declaratory judgment of non-infringement, invalidity, and unenforceability of AC's patents.  AC responded by denying all claims and by asserting counterclaims of infringement of three separate patents in three separate ways: direct infringement, contributory infringement, and inducement of infringement of U.S. Patent Nos. 6,649,159; 6,759,038; and 6,251,384. *See D.I. 15, AC's Counterclaims; see also U.S. Patent Nos. 6,649,159; 6,759,038; and 6,251,384 attached hereto as Exhibit 1.*

All claims and counterclaims were resolved in MKT's favor pursuant to a joint motion dismiss.  AC agreed to the joint dismissal only because MKT prepared and served a ready-for-filing Rule 11 Motion.  Rather than challenge the motion, AC sought to "withdraw" its infringement counterclaims pursuant to the safe harbor provision of Rule 11.  AC agreed to a stipulated dismissal that (1) dismissed AC's infringement claims with prejudice; (2) included a declaration of non-infringement in resolution of MKT's claim for declaratory judgment of non-infringement; and (3) gave leave to AC to file an Amended Complaint wherein its infringement claims were

---

- 3:07-cv-02294-MMA-BLM filed 12/07/2007 asserting infringement of patent Nos. 5,998,191; 6,066,467; 6,140,102; 6,448,446; and 6,468,762; as well as various other claims
- 3:07-cv-01004-JLS –AJB filed 06/01/2007 asserting infringement of patent Nos. 6,232,523; 6,235,968; 6,251,384; 6,649,159; 6,759,038;
- 3:09-cv-00351-JLS –RBB filed 02/23/2009 asserting infringement of patent Nos. 6,251,384; 6,649,159; 6,759,038;
- 3:09-cv-01311-AJB –JMA filed 06/17/2009 asserting infringement of patent Nos. 6,251,384; 6,649,159; 6,759,038;
- 3:10-cv-02343-JAH –JMA filed 11/15/2010 asserting infringement of patent Nos. 6,649,159 and 6,759,038;
- 3:10-cv-02515-MMA –BLM filed 12/08/2010 asserting infringement of patent Nos. 6,649,159 and 6,759,038 as well as various other claims

3

eliminated and wherein AC admitted that its patents were not infringed. *The dismissal also included the stipulated finding that MKT does not and has not infringed the patents-in-suit.*

In response to MKT's declaratory judgment action, AC should have simply admitted that there was no infringement and foregone any infringement claims. Although this was the ultimate outcome with AC's Amended Answer, *AC forced MKT to litigate baseless claims that AC knew or should have known were baseless for over two years.*

## **LEGAL STANDARD**

The Federal Circuit summarized the subjective/objective standard for awarding attorney's fees under Section 285 in *Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 687 F.3d 1300, 1308-1309 (Fed. Cir. 2012):

> It is established law under section 285 that absent misconduct in the course of the litigation or in securing the patent, sanctions may be imposed against the patentee only if two separate criteria are satisfied: (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless. *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). The requirement that the litigation be objectively baseless "does not depend on the state of mind of the [party] at the time the action was commenced, but rather requires an objective assessment of the merits." *Id*. at 1382. "**To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits**." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (internal quotation marks omitted).
> Furthermore, even if the claim is objectively baseless, it must

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

be shown that lack of objective foundation for the claim "**was either known or so obvious that it should have been known**" by the party asserting the claim. *In re Seagate Tech.*, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007); see also iLOR, LLC v. Google, Inc., 631 F.3d 1372, 1377 (Fed. Cir. 2011). This is known as the subjective prong of the inquiry. This same objective/subjective standard applies for both patentees asserting claims of infringement and alleged infringers defending against claims of infringement. See iLOR, 631 F.3d at 1377.

*Id.* (emphasis added).  Accordingly, sanctions should be awarded if "no reasonable litigant could reasonably expect success on the merits" and if this was "either known or so obvious it should have been known" to the patentee.

The Federal Circuit reviews a finding of an exceptional case for clear error and the award of attorney's fees for abuse of discretion.

## <u>AC's ASSERTED CLAIMS AND PATENTS</u>

MKT is a French company in the business of developing, manufacturing, and selling a general purpose fluorescent confocal microscope that has a thin, flexible probe composed of fiber optic bundles.

AC alleged that MKT itself directly infringed by carrying out each step of the complex research methodologies of the claims, in particular during promotional demonstrations of the microscope.  AC also alleged that the mere sale of the microscope constitutes contributory infringement, which is necessarily predicated on the allegation that the microscope does not have substantial non-infringing uses.   AC also alleged that MKT induced its customers to carry out each step of the claimed methods, which is necessarily predicated on proof of actual third party direct infringement.

5

All asserted claims in the three patents asserted by AC are methods claims directed to particular methods of observing and imaging fluorescence in a research animal, wherein the fluorescence arises from Green Fluorescent Protein ("GFP").  *See Exhibit. 1, the patents-in-suit, and Exhibit 2, AC's Disclosure of Asserted Claims and Infringement Chart*.  GFP is a protein originally discovered in Jellyfish.  GFP fluoresces green light when illuminated with light of another color.  *See, for example, the '384 Patent, column 4, lines 8-17, Exhibit 1 page 33*.  However, the claimed methods do not in any way broadly or generally cover merely using or imaging GFP in research animals.  Rather, the claims are narrowly drawn to very specific research protocols that use the fluorescence from GFP in a specified way as a marker for some specific biological process or event.

In particular, the methods claimed in the '038 and '384 patents are limited to observing the progression of cancer "metastasis" by observing both a primary tumor and a metastasized secondary tumor that is remote from the primary tumor and which arose from the primary tumor, wherein the cells of the tumors fluoresce due to the expression of the GFP gene in the tumor cells to create a GFP protein whose fluorescence can be imaged.  The fluorescence of the GFP protein in the tumor cells serves as a relatively easily observed marker for the presence and quantity of tumor cells at the sites of the primary and secondary tumors.  The '384 claims include additional requirements regarding where and how the tumor must be implanted into the subject ("orthotopic" placement of the "tumor" by "surgical" "implantation").

6

It is important to note that GFP can be used as a marker in animal research protocols, even in tumors, in many different ways that do not infringe the methodologies claimed in the '038 and '384 patents.  In particular, if GFP is not being used as a marker to "monitor" "metastasis" then the method does not infringe either patent.  For example, if the GFP is being used merely to monitor the growth or enlargement of a single tumor, without any monitoring of the spread of the tumor to create secondary tumors, then this is not monitoring "metastasis" as required by all asserted claims of the '038 and '384 patents.  Also, for the '384 patent, if the tumor cells are not placed into the animal in the particular manner ("surgical) and location ("orthotopic") required by the '384 claims, then this patent cannot be infringed.

The methods claimed in the '159 patent are limited to "monitoring the ability of a promoter[2] to promote the expression of an endogenous gene" by a method wherein the endogenous gene is replaced or supplemented with the GFP gene, "whereby the ability of said promoter to promote expression is monitored."

As further specified in the sole independent claim, the GFP gene is "operatively linked" to the promoter whose "ability to promote" is being monitored.  The fluorescence of the GFP protein therefore acts as a marker for the "ability of the promoter to promote the expression of the endogenous gene":  when the GFP gene is being expressed to produce the GFP protein, resulting in observable fluorescence, the

---

[2] A "promoter" is the upstream portion of the gene that turns the gene on and off, thereby controlling "expression", i.e. whether the gene is transcribed into a protein.

7

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

researcher knows that conditions in the cell are such that the promoter of the endogenous gene (the endogenous promoter) is trying to promote the endogenous gene, but because the endogenous gene has been "operatively linked" to the GFP gene, the promoter instead (or also) promotes the expression of the fluorescent, easily observable, GFP protein from the GFP gene.

The endogenous promoter connected to the GFP gene essentially acts as a surrogate for the expression of the endogenous gene. *See the '159 Patent at Column 13, lines 46-53 and Column 14, lines 1-15, Exhibit 1 page 10, which explains how and why the claimed methodology works with respect to observing the ability of an endogenous promoter to promote*.  In this way, the claimed method of "monitoring the ability of a promoter to promote the expression of an endogenous gene" is effected by a technique that uses GFP as a marker or "surrogate."

It is important to note that GFP can be, and commonly is, expressed in engineered cells for use as a marker pursuant to methodologies that cannot infringe upon the specific methodology claimed in the '159 patent.  Any method that uses GFP as a marker for any purpose other than for "monitoring the ability of a promoter to promote the expression of an endogenous gene" does not fall within the claim.

In particular, both parties' proposed claim constructions acknowledged that the use of a viral promoter to control the expression of the GFP gene does not fall within the claimed methodology.  This is because viral promoters are non-endogenous and are used to constitutively express whatever gene to which they are connected.  Constitutive expression of GFP under the control of a viral promoter is commonly

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

8

used to determine whether cells engineered to express GFP are present or not, and in what quantity.[3]  However, constitutive expression of GFP under the control of a viral promoter does not conform to the "promoter monitoring" element of the '159 patent. In recognition of this fact, both parties proposed claim constructions excluded the use of viral promoters from the scope of the '159 claim.

## **ARGUMENT**

## I.   **AC Knew or Should Have Known That Each Of Its Contributory Infringement Claims Was Baseless Because MKT's Microscope Has Easily Identifiable And Substantial Non-Infringing Uses**

Hornbook patent law required AC to prove, as part of its three contributory infringement claims, that MKT's microscope does not have substantial non-infringing uses.  *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006) (noting that it is the patentee's burden to affirmatively prove the absence of non-infringing uses).  AC's three contributory infringement claims are baseless because MKT's microscope has substantial non-infringing uses.  AC knew or should have known of the non-infringing uses because, at the time it filed its infringement claims, AC had collected voluminous literature that clearly show such uses.

MKT's microscope can image fluorescence from a wide range of fluorescent dyes and reagents, and is in no way limited to imaging fluorescence from GFP.  In the context of clinical use on human patients, which is the purpose for which most of the devices are sold, the microscope (used as an endoscope) is used exclusively with

---

[3] This is precisely the way in which GFP is used in the techniques claimed in

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

fluorescent dyes and non-GFP fluorescent reagents because it is not legal or medically ethical to genetically engineer a human to express a fluorescent protein from a jellyfish.  In the context of animal research, fluorescent dyes and non-GFP fluorescent reagents are also commonly and extensively used by MKT's pre-clinical microscope customers.

Because all of AC's claims are strictly limited to imaging or monitoring fluorescence from GFP, any and all uses of MKT's microscope with fluorescent dyes are necessarily non-infringing uses.

Even the most minimally reasonable and competent review of MKT's brochures, websites, or press releases, or of third party publications describing the use of MKT's products, would have shown that MKT's microscope is capable of substantial non-infringing uses in connection with fluorescent dyes.

AC's initial disclosures under Fed. R. Civ. P. 26(a)(1)(A)(ii), which AC produced shortly after filing its infringement claims, included almost 1,000 documents related to the use of MKT's microscope.  These included MKT brochures, press releases, manuals, and websites, as well as many publications from third parties discussing the use of the microscope.  AC had acquired and possessed these documents prior to asserting its contributory infringement claims.  AC confirms this fact in its responses to MKT's discovery requests.  *See AC's response to MKT's document request No 1, Exhibit 4, page 158-9.*

the '038 and '384 Patents.

These documents, some of which are attached hereto as Exhibit 3, show that MKT's microscope has substantial non-infringing uses. *See Exhibit 3, pages 106-133; the underlining has been added by the undersigned for emphasis on relevant pages.* Regarding the use of MKT's microscope, the literature notes that, "A variety of fluorescent dyes and labels may be used for in vivo imaging," for example "calcium sensitive dyes" (page 107). An MKT press release identifies clinical uses in connection with the dye fluorecein (pages 108-110). Researches at the NIH used a fluorescent dye to image the crushed nerves of rats (page 111). French researchers used the dye fluorescein (or "FITC") (pages 114-118). A brochure from MKT's distributor notes that the microscope is "compatible with fluorescent dyes used in vivo" and highlights a specific example the use of "a fluorescent plasma-labeling dye intravenously" (page 126-127). A bibliography from the same distributor identifies various instances where MKT's microscope has been used with dyes (page 128-129). MKT's website notes that "Cellvizio®–LAB functions with a wide array of standard, third-party fluorescence dyes and markers" (page 130). A FAQ originating from MKT focuses on staining and labeling tissues with fluorescent dyes prior to imaging with MKT's microscope (pages 131-133).

These are just some of the clinical and pre-clinical examples of non-GFP uses of MKT's microscope contained in the documents. All such uses constitute non-infringing uses merely because there is no use of GFP. MKT notes again that all clinical uses of the device do not involve GFP, that only a small set of pre-clinical/animal uses involve GFP, and that even where GFP is used, there are many

11

ways to use MKT's microscope with GFP in non-infringing ways (as noted more fully in the sections below).

Based on the fact that AC had collected all the documents referenced above prior to asserting its contributory infringement claims, and the fact that neither the law nor the documents are in any way ambiguous, the Court should find the AC knew or should have known that its three contributory infringement claims were baseless.

## II. AC Knew or Should Have Known That Its Indirect Infringement Claims Were Because AC's Asserted Instances Of Third Party Direct Infringement Do Not Constitute Infringement Even Under AC's Proposed Claim Constructions

There can be no inducement of infringement or contributory infringement under 35 U.S.C. § 271(b) and (c) in the absence of third party direct infringement.  It was AC's burden to prove the occurrence of third party direct infringement to maintain claims for indirect infringement.  *Epcon Gas Sys. Inc. v. Bauer Compressors*, Inc., 279 F.3d 1022, 1033 (Fed. Cir. 2002) ("Upon a failure of proof of direct infringement, any claim of inducement of infringement also fails.").

AC's infringement contentions identify only three instances of alleged third party direct infringement.  *See AC's Disclosure of Asserted Claims and Infringement Chart, Exhibit 2, pages 39-105*.  AC has never asserted a "class" of third party direct infringers such as MKT's customers.  Any such generic, unspecific allegation of a "class" of third party direct infringers would be frivolous because of the substantial non-infringing uses noted above.

For the '038 and '384 patents, AC's Infringement Chart identifies International

Patent Application Publication WO 2010/059233 ("the '233 Application Publication") as third party direct infringement. *Id. at pages 43-75; also, the '233 Application Publication is attached hereto as Exhibit 5.* This application is by Veena Rao of the Morehouse School of Medicine. *See Exhibit 5, page 168.*

For the '159 patent, AC's Infringement Chart identifies two academic articles as third party direct infringement: "The longest telomeres: a general signature of adult stem cell compartments" ("the Telomere Article"), and "Novel, Injectable, Exogenously Regulated, Engineered Stem Cell-Based System For Anterior Spinal Fusion" (the "Stem-Cell Article"). *See AC's Disclosure of Asserted Claims and Infringement Chart, Exhibit 2, pages 76-103; also, these two articles are attached hereto as Exhibits 6 and 7.*

The Telomere Article is authored by five (5) authors located at an institution in Spain, and one (1) author, George Cotsarelis, located at the University of Pennsylvania. *See Exhibit 6, page 196.* The Stem Cell Article is authored by five (5) authors located at an institution in Israel, and one (1) author, R.J. Oskouian, located at Nanospine, Inc. in Philadelphia. *See Exhibit 7, page 210.*

AC confirmed in its discovery responses that its only alleged third party direct infringers are Mr. Costarelis at the University of Pennsylvania; Mr. Oskouian of Nanospine, Inc.; and Ms. Rao of the Morehouse school of Medicine. *See AC's response to MKT's interrogatory No. 2, Exhibit 4, pages 138-39.*

**A.    The '233 Application Publication does not describe direct infringement of the '384 or '038 Patents**

13

### 1. The '233 Application Publication does not describe direct infringement of either the '384 or '038 Patent because it does not describe "monitoring . . . metastasis"

All asserted claims of the '038 and '384 are limited to monitoring "metastasis." *See AC's Infringement Chart, Exhibit 1, pages 43-75.* However, the '233 Application Publication does not disclose monitoring "metastasis" under even AC's proposed construction of "metastasis" because the activity described in the '233 reference is limited to monitoring only the growth or enlargement of a primary tumor in a single part of the body, and does not describe observing secondary tumors remote from the primary tumor in other, various parts of the body of the animal subject.[4]

The '233 reference does not describe identifying and monitoring a secondary tumor remote from the primary tumor. *See AC's responses to MKT's Request for Admission No. 4, Exhibit 4, page 148; see also the '233 reference, Exhibit 5, page 188.* The reference does not disclose monitoring any part of the animal other than the part of the animal into which the cancer cells were injected. *Id.* The reference does not disclose monitoring any tumor other than the tumor that arose from the injection of tumor cells at the site of injection. *Id.* The reference therefore discloses at most monitoring the enlargement and status of a primary tumor, and does not disclose

---

[4] There is no dispute regarding content of the reference; AC admits in its discovery responses that it describes monitoring only the growth or enlargement of a primary tumor in a single part of the body, and does not describe observing secondary tumors remote from the primary tumor in other parts of the body of the animal subject. *See AC's responses to MKT's Request for Admission No. 4, Exhibit 4, page 148.*

14

monitoring "metastasis" as required by the claims of the '038 and '384 patents.[5]

AC's proposed construction for "metastasis" is "the progression, spread, and migration of cancer over time from its initial or primary tumor site via various routes to another part of the body, and/or growth of secondary tumors at that other part of the body."[6]   *See Docket Entry No. 34, Joint Claim Construction Chart.*  AC therefore agrees that tumor "metastasis" is not merely the growth of a tumor, but is instead a disease process whereby a primary tumor spreads to another part of the body to create a remote secondary tumor.  *See Docket Entry No. 40, AC's Responsive Claim Construction Brief at page 7*.  Accordingly, the activity in the '233 reference does not fall within any claim of the '038 or '384 patent, even under AC's proposed construction.

AC's indirect infringement claims require proof of direct infringement, and the only proffered direct infringement – the activity in the '233 reference – is demonstrably not direct infringement even under AC proposed claim construction. Based on these facts, AC knew or should have known that its claims are baseless.

> **2.      The '233 Application Publication does not describe direct infringement of the '384 Patent because it does not describe "orthotopic implantation"**

---

[5] It is not surprising that the reference does not disclose monitoring metastasis because the researchers were not interested in metastasis and the cancer model used with the animals was not geared toward creating or assessing metastasis or metastases.

[6] MKT's proposed construction is substantially the same, but is clearer and more closely tracks the definition given in the specification.

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

The '384 claims are additionally limited to "orthotopic implantation" of tumors. There is no dispute that "orthotopic implantation" means implantation of the tumor into the tissue of the animal that corresponds to the origin of the tumor (i.e. pancreas tumor cells are implanted into the pancreas of the subject; breast tumor cells are implanted into the breast tissue of the subject, etc.). However, the '233 reference describes only subcutaneous implantation of breast, kidney, ovary, and prostate tumor cells.[7] In short, the '233 authors use only a subcutaneous model of tumor implantation, while the '384 patent claims are strictly limited to an orthotopic model of tumor implantation.

## B.   The Stem-Cell Article does not describe direct infringement of the '159 patent under the agreed meaning of the claims

The claims of the '159 patent require an endogenous promoter "operatively linked" to a GFP gene so that the endogenous promoter controls the expression of the GFP protein. The easily observable GFP gene serves as a marker that allows the observer to carry out the claimed methodology, which is: "A method to monitor the ability of a promoter to promote expression in an animal of an endogenous gene that is

---

[7] The '233 reference discloses using the following tumor cell lines:

| | | |
|---|---|---|
| a. | MCF-7 | human breast adenocarcinoma cell line |
| b. | T47D | human ductal breast epithelial tumor cell line |
| c. | COS-1 | African Green monkey kidney tumor cell line |
| d. | CAL-51 | human breast cancer cell line |
| e. | ES-2 | human ovarian clear cell carcinoma cell line |
| f. | PC-3 | human prostate cancer cell line |

*See '233 reference, Exhibit 5, page 175, line 5, and page 187, line 29.*

16

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

controlled by said promoter, . . . whereby the ability of said promoter to promote expression is monitored."  In short, the claims requires a construct comprising an endogenous promoter operatively linked to a GFP gene, and this construct must be used to "monitor the ability of a promoter to promote expression in an animal of an endogenous gene that is controlled by said promoter."  Neither of these requirements is in the Stem-Cell Article.

AntiCancer agrees in its proposed claim constructions that the claimed "promoter of said endogenous gene" that is "operatively linked" to the GFP gene does not encompass "an artificially employed promoter such as a viral promoter."  *See D.I. 34, Joint Claim Construction Chart, at page 2, AC's proposed construction for "promoter of said endogenous gene."*  However, there is only one promoter-GFP construct in the Stem-Cell Article and it is disclosed has having a retrovirus promoter. A retrovirus promoter is a virus promoter, which even AC's proposed claim constructions agree is outside the scope of the claimed "promoter of said endogenous gene."  Accordingly, there is no way in which the Stem-Cell Article could possibly be used to evidence third party direct infringement.

There is a second way in which the Stem-Cell Article cannot possibly evidence third party direct infringement.  The promoter-GFP construct used in the Article, in addition to not being the claimed type of promoter-GFP construct, is not used in the Article to carry out the claimed methodology of  "A method to monitor the ability of a promoter to promote expression in an animal of an endogenous gene that is controlled by said promoter, . . ."  Instead, the promoter-GFP construct disclosed in the Stem-

17

**Young & Thompson**
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

Cell Article is used to allow the authors to monitor the quantity and location of stem cells in the animal subject.

The Stem-Cell Article is clear that the fluorescence of GFP is used to monitor the presence, quantity, and viability of cells after injection:

> In addition, engineered MSCs [cells] were also infected with retroviruses encoding for the luciferase or green fluorescent protein (GFP) marker gene. **Cell survival** within the disc **was monitored** noninvasively by using a **quantitative** bioluminescence imaging system and a novel in vivo fibered confocal microscopy imaging system (Cell-vizio).
> . . .
> In vivo quantitative noninvasive imaging of the injected genetically engineered MSCs [stem cells] was achieved using the bioluminescence system. . . . In addition, **to detect GFP labelling** at the cellular level, we used a novel system of molecular imaging called Cell-vizio. This is a fluorescence based imaging system based on a fibered confocal microscope, which is able to **detect viable cells expressing the GFP marker** gene in the intervertebral disc **up to 4 weeks postinjection** (Figure 3B).

*See Exhibit 7, highlighted portions (emphasis added).*[8]  There is no suggestion that the fluorescence of GFP is being used to monitor the promoting ability of the promoter to which it is operatively linked as required by the claim.

As suggested above in the AC's ASSERTED CLAIMS AND PATENTS section, the Stem Cell article is an example of using GFP to monitor the presence and

---

[8] MKT notes that the Stem-Cell Article discloses a second promoter-gene construct in the form of a promoter and a bone growth gene.  However, this second construct does not include a GFP gene, so it cannot possibly constitute the promoter-gene construct of the claim.  Moreover, the activity of this second construct (the growth of bone) is observed using CT scans in the Article, not MKT's microscope.  This is a second reason why this second construct cannot possibly be relevant to the claims.

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

quantity of engineered cells by using a viral promoter to express GFP continuously and at a high level regardless of the condition inside the cell (constitutive expression). In contrast, the '159 methods are limited to using GFP to monitor the ability of a promoter to promote expression of an endogenous gene by using the endogenous promoter of the endogenous gene to promote expression of GFP as if it were promoting expression of the endogenous gene.

### C.   AC Knew Or Should Have Known That Territorial Issues Also Preclude The Telomere Article And The Stem-Cell Article From Constituting Third Party Direct Infringement

Regarding the Telomere article, only one of the six authors is located in the U.S., with the other five located in Spain. *Exhibit 6, page 349*.  Moreover, the Acknowledgments section of the article indicates that the imaging and animal care took place in Spain.  *Exhibit 6, page 208*.  Also, minimal investigation shows that the one U.S.-based author developed the genetically engineered mouse strain that is used in the article.  *See Exhibit 6, page 209, the highlighted article relates how it was Dr. Cotsarelis who originally created the strain of transgenic mice used in the Telomere Article*.  In light of the fact that the animal care and imaging took place in Spain, the only objective conclusion to draw from  a reasonable and competent pre-filing investigation is that the one U.S. author merely provided the transgenic mice for use in Spain, and the other authors in Spain carried out the animal care and animal imaging using MKT's microscope.

Regarding the Stem-Cell Article, four of the five authors are located in Israel and those Israeli authors have authored other articles related to Mauna Kea's

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

microscope, while the one U.S.-based author of the article has not authored any other articles related to Mauna Kea's microscope.  *Exhibit 7, page 210.*

Use of MKT's microscope outside the U.S. cannot constitute third party direct infringement for purposes of AC's indirect infringement claims against MKT.  The relationship between direct and indirect infringement affects the territorial scope of the liability for indirect infringement.  Thus, the Supreme Court held in *Deepsouth Packing Co., Inc. v. Laitram Corp.*, 406 U.S. 518 (1972), that it was not contributory infringement to sell an especially designed component abroad for assembly into a product that is patented in the U.S. because the foreign assembly did not constitute direct infringement.  The Deepsouth case therefore involved the territorial limits of contributory infringement of apparatus claims.  In contrast, the issue here is the territorial limits of inducement of infringement of method claims.

Congress enacted 35 U.S.C. § 271(f) to overrule Deepsouth with respect to its application to apparatus claims: for apparatus claims, Section 271(f) provides that foreign third party direct infringement could give rise to both contributory and induced infringement liability in the U.S.  But the Deepsouth rationale applies equally to the other type of indirect infringement, inducement of infringement, and to the other type of claims, method claims.  In short, the use of a device abroad to practice methods that are patented in the U.S. cannot give rise to inducement of infringement claims in the U.S. because the foreign use does not constitute direct infringement.

The Federal Circuit has held *en banc* that § 271(f) does not apply to method claims.  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1364 (Fed.

**11-cv-1407 CAB JMA**

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

Cir. 2009) (en banc).  Cardiac Pacemakers affirmed that method patents do not have extraterritorial reach, which is exactly what one would expect from the holding of Deepsouth and in light of the fact that the statutory changes enacted by Congress to avoid Deepsouth with respect to apparatus claims do not apply to method claims. Accordingly, the strict territorial limitations applied in Deepsouth are applicable to induced infringement of method claims.  AC knew or should have known that asserting foreign instances of third party direct infringement render its indirect infringement claims baseless.

**III.    AC Knew Or Should Have Known That Its Claims For Direct Infringement Are Baseless Because MKT Is A Device Manufacturer That Does Not Itself Practiced Each Step Of Narrow, Specialized Research Methodologies Such As In AC's Claims**

Sections I and II above demonstrate how vanishingly narrow AC's patent claims are.  AC's claims are so narrow that it could not even identify or allege a single instance of third party direct infringement.  Nonetheless, AC alleged that MKT, a device manufacturer, itself directly infringed by carrying out each and every step of the claimed methodologies.  *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206 (Fed. Cir. 2010) (the practice of "all steps of the claimed method" is required for direct infringement of method claims).

AC's direct infringement claim for each patent stems solely from AC's speculation that MKT conducted promotional demonstrations to its customers wherein MKT practiced each step of the claimed methodologies.  *See Exhibit 4, page 138, AC's Response to MKT's Interrogatory No. 1.*  However, AC's discovery responses

21

and infringement contentions make it clear that it has **no information** regarding any promotional demonstration wherein MKT is alleged to have practiced each step of the asserted method claims. *Id.* Absent any such information, and in light of the narrowness of AC's claims, and in light of the fact that MKT is merely a device manufacture not engaged in animal research, AC's direct infringement claims are objectively baseless, a fact which AC subjectively knew or should have known.

## IV. AC Knew Or Should Have Known That MKT's Manuals And Promotional Literature Cannot Support AC's Inducement of Infringement Claims As A Matter Of Law

AC's inducement of infringement claims stem solely from AC's belief that MKT's brochures and promotional presentations constitute inducement of direct infringement by its customers. *Exhibit 4, page 141, AC's response to MKT's Interrogatory No. 9.* However,

> It is well settled that excerpts from user manuals as evidence of underlying direct infringement by third parties of products that can be used in a non-infringing manner are by themselves insufficient to show the predicate acts necessary for inducement of infringement. *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007). When manuals only teach "customers each step of the claimed method in isolation," but not "all the steps of the claimed method together," the manuals alone cannot support infringement. *Id.* at 1222. Such a manual does not show that all of the steps were performed together.

*Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1360 (Fed. Cir. 2012). MKT's brochures and promotional literature were freely available to AC and AC appears to have collected many of these prior to filing suit. However, these materials do not teach each and every step of the claimed methodologies, much less each step together in the same location and in the claimed order, as required by the Federal Circuit.

22

Young & Thompson
209 Madison St., Suite500
Alexandria, VA 22314
(703) 521-2297

According to this clear law, AC subjectively knew or should have known that its inducement claims based on promotional literature was objectively baseless.

**V.     AC Knew Or Should Have Known That Its Inadequate Infringement Contentions Rendered Its Claims Baseless**

AC's Preliminary Infringement Contentions (PICs) in this case, served February 14, 2012 and attached hereto as Exhibit 2, p.39-103, are conclusory and (1) entirely omit contentions regarding required claim elements and (2) fail to provide required detail for all claim elements as to how MKT infringed directly and indirectly.

In particular, AC's infringement chart for the '038 and '384 patents lack contentions regarding the "metastasis"/"monitoring the progression of metastasis" elements (which is an element of all asserted independent claims).  *See Ex. 2, pages 43-75*.   Regarding the '159 patent, the chart does not address in any way the "promoter monitoring" element (which is an element of all asserted independent claims).

The insufficient PICs render AC's infringement claims baseless.  Moreover, AC knew or should have known this because, prior to serving its PICs in this case, this Court had granted summary judgment against AC in two other cases based on a failure to identify in detail "where each element of each asserted claim is found within each Accused Instrumentality" as required by the Patent Local Rules.  On May 14, 2008, this Court granted summary judgment against AC for each asserted patent claim wherein the Court found AC's PICs had failed to make allegations regarding an element in that claim.  *See Ex. 8, pgs. 219-220, D.I. 49 in Case No.:07-cv-01004-JLS-*

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

*AJB, AntiCacner v. Carestream Health, Inc.* In a another case, on February 13, 2009, this Court similarly granted summary judgment of non-infringement of the '384, 038, and '159 patents based on insufficient PICs that fail to identify "where each element of each asserted claim is found within each Accused Instrumentality". *See Ex. 9, pg. 232, D.I. 214 in Case No. 3:07-cv-00097-JLS-RBB, AntiCancer, Inc. v. Cambridge Research & Instrumentation*.

In a third summary judgment decision in a third case well after the two decisions noted above (and essentially contemporaneously with this case) this Court reached a similar decision and further found that AC's PICs were "unreasonable" and "disingenuous" in light of the prior two decisions:

> [T]he Court has concluded that AntiCancer's PICs are deficient, and further finds that **AntiCancer acted unreasonably** in submitting woefully insufficient PICs. It seems to the Court that AntiCancer was **disingenuous** in setting forth its theory of infringement with such vague PICs **given that it was made aware of the possible repercussions of insufficient PICS on at least two prior occasions** in cases before this Court.

*See Ex. 10, pg. 243-246, and 249-250,& Ex. 11, pg 252, D.I. 63 & 74 in Case No. 3:11-cv-00107-JLS-RBB, AntiCancer, Inc. v. Pfizer et al. (emphasis added).* Moreover, this Court required AC's to pay the defendant's attorney's fees attributable to its motion. *See Ex. 11, pg. 252.*

AC was just as unreasonable and disingenuous in this case when it asserted insufficient PICs. AC knew or should have known that its insufficient PICs rendered its infringement claims baseless.

## VI. Mauna Kea Should Be Awarded $193,198.50 In Attorney's Fees And Costs

To determine a reasonable attorneys' fee award, the Supreme Court has directed trial courts to multiply the number of hours reasonably spent on the litigation by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). In support of this fee application, MKT is filing under a declaration from Jeffrey Goehring (and supporting exhibits). The declarations set forth the nature and extent of the legal services Young & Thompson provided to MKT in connection with this action, the hourly rates Young & Thompson charged, and the number of hours each Young & Thompson attorney billed. As explained in the Declaration, the attorneys' fees MKT seeks are based on reasonable billing rates multiplied by the number of hours reasonably spent on this action.

Time spent preparing and litigating fee petitions is compensable. *See Anderson v. Dir., Office of Workers Comp. Programs*, 91 F.3d 1322, 1325 (9th Cir.1996).

As detailed in the Goehring declaration, the fees and costs MKT incurred in connection with this action since AC filed its baseless counterclaim totaled $193,198.50.

## CONCLUSION

The Court should award $193,198.50 for the reasons noted above.

August 9, 2013

YOUNG & THOMPSON

By:   /s/ Jeffrey M. Goehring
      Jeffrey M. Goehring

Counsel for Mauna Kea Technologies

Young & Thompson
209 Madison St., Suite 500
Alexandria, VA 22314
(703) 521-2297

25